# UNITED STATES DISTRICT COURT FILED

**EASTERN** DISTRICT OF **CALIFORNIA**    JUN 1 4 2010

——————————————oOo——————————————

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA
v.

Yan Akhumov
500 Emmons Street
Sacramento, CA 95838

**CRIMINAL COMPLAINT**

CASE NUMBER: **2 1 0 • MJ - 0 1 7 0**

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about April 2007 through 2009 in Sacramento and Yolo Counties, and elsewhere, in the Eastern District of California defendant(s) did, (Track Statutory Language of Offense)

▸ **willfully infringe a copyright by reproducing or distributing one or more copyrighted works valued at more than $2,500 within a 180-day period; knowingly and intentionally traffic in a counterfeit label, illicit label, or counterfeit documentation or packaging designed to be affixed to a copy of a motion picture or music compact disk; intentionally traffic or attempt to traffic in goods or services, while knowingly using on or in connection with such goods, when such use was likely to cause confusion, mistake, or to deceive; and knowingly trafficked in one or more unauthorized access devices, during any one year period, and by such conduct obtained things of value aggregating $1,000 or more.**

in violation of Title **17**, United States Code, Section **506(a)** and Title **18**, United States Code, Sections **2319, 2318, 2320, and 1029(a)**. I further state that I am a(n)  and that this complaint is based on the following facts:

▸ **See affidavit attached hereto and incorporated by reference**

Continued on the attached sheet and made a part of this complaint: __X__

Signature of Complainant TFO D.T. Brown Special Deputy,
U.S. Marshals Service

Sworn to before me, and signed in my presence

__6/14/10__
Date

at __Sacramento, CA__
City          State

Hon. Kimberly J. Mueller    U.S. Magistrate Judge
Name of Judge          Title of Judge

Signature of Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## CRIMINAL COMPLAINT

I, Task Force Officer (TFO) Detective D.T. Brown #938, a Deputy Detective of the Sacramento County Sheriff's Department and a Special Deputy-US Marshal of the United States Department of Justice, being duly sworn, depose and state as follows:

**Background**

       1.    I am a Detective assigned to the Sacramento Valley Hi-Tech Crime Task Force. In addition, I am a Special Deputy-US Marshal United States Department of Justice and have been so sworn since February 2008. As part of my duties, I investigate intellectual property offenses including those involving computer technology and financial fraud. I have received training regarding intellectual property rights violations, computer technology, computer fraud, counterfeiting, credit card fraud, and other white collar crime. I have worked as a case agent in numerous cases involving criminal copyright and trademark violations, credit card fraud, counterfeiting, and other fraud related crimes. In that capacity, I have become familiar with the investigation and prosecution of intellectual property rights violations, criminal copyright cases, including the use of various criminal methods to perpetrate these frauds. I have also become familiar with identifying the elements of counterfeit product such as digital media (DVDs and CDs) and counterfeit/pirated merchandise. In addition, I have completed over 120 college units and have obtained a Bachelor of Arts degree in Criminal Justice.

       2.    I have participated in investigations to include cases involving access device fraud, wire fraud, counterfeiting of access devices, identity theft, computer fraud, mortgage fraud and identity document fraud. I have consulted with agents of the Secret Service and other law enforcement agencies regarding the investigation and prosecution of access device fraud cases.

       3.    Based on my training and experience from past counterfeit/unauthorized access device fraud investigations and consultation with other law enforcement officers regarding various counterfeit/unauthorized access device, and wire fraud investigations, I am aware that these fraudulent schemes involve a number of component activities including, the legal and illegal obtaining of, and trafficking in, valid credit card account numbers. The unauthorized credit card account numbers are charged for various amounts. The transactions are posted to an authorized merchant terminal. The credit card is not physically present and the magnetic stripe is not swiped during these transactions. Rather, the credit card number is manually keyed into the merchant's terminal.

       4.    I am familiar with the information contained in this affidavit based on: (i) direct knowledge of each of the following facts, or upon information provided to me by other law enforcement officers; (ii) interviews conducted with, and correspondence received from, various individuals including experts in the field of Trademark and Copyright Fraud, and victims of credit card fraud, and (iii) information received from third parties, such as Motion Picture Association of America (MPAA) and the Recording

Industry of America (RIAA).. Not all of the facts known to me are included herein; I have only included those facts necessary to show that probable cause exists to believe that **YAN AKHUMOV** committed the federal violations identified in the Statutes Section below.

5.    I make this affidavit in support of the issuance of a criminal complaint against:

      a.    **YAN AKHUMOV**
          DOB: 7/6/1965

6.    Based on the information set forth herein, there is probable cause to believe, and I do believe, that from in or about April 2007, through the present **YAN AKHUMOV** has committed offenses against the United States, namely: criminal copyright law, in violation of 17 U.S.C. § 506(a) and 18 U.S.C. § 2319, and criminal trademark laws, in violation of 18 U.S.C. § 2318 and § 2320 and 18 USC 1029(a)(2) – Access Device Fraud.

## Statutes

7.    Under 17 U.S.C. § 506(a) and 18 U.S.C. § 2319, it is a crime to willfully infringe a copyright by reproducing or distributing one or more copyrighted works.  If the retail value of the infringed items is more than $1,000 within a 180-day period, or if the infringement has a profit motive, the crime is a misdemeanor.  If the retail value of the infringed items is more than $2,500 within a 180-day period, the crime is a felony.

8.    Under 18 U.S.C. § 2318 and 18 U.S.C. § 2320, it is a crime to knowingly and intentionally traffic in goods with counterfeit marks or marks intended to cause confusion, mistake or to deceive or traffic counterfeit labels, illicit labels, or counterfeit documentation or packaging designed to be affixed to a copy of a motion picture or music compact disk, knowing the labels to be counterfeit, and that a copyright existed for the item.

9.    Under 18 USC Section 1029(a) (2), it is a felony to knowingly and with the intent to defraud, traffic in or use one or more unauthorized access devices during any one-year period, and by such conduct obtain anything of value aggregating more than $1,000.

## Probable Cause to Believe Copyright and Trademark Violations Occurred

10.    From approximately April 2007, through the July 2, 2009, **YAN AKHUMOV**, engaged in distribution of counterfeit music CDs and movie DVDs, and counterfeit registered trademarks from multiple locations throughout Sacramento California, in violation of the federal copyright and trademark laws.

11.    On Thursday July 2, 2009, Rancho Cordova (California) Police Officers C. Gailey #1380 and C. Baker #324 responded to a disturbance call at a business called

Music Land near the corner of Coloma Road and Sunrise Boulevard (actual address 11082 Coloma Road). The complainant (person who placed the call into the police department and requested the police respond), identified as Inna L., reported they had rented two DVD movies from Music Land and discovered the DVDs were copies (on a DVD-R) and not the original movie DVDs. Neither of the DVDs worked so, she returned to Music Land for a refund but the clerk, identified as Alexandr Podgorneac, refused. As the officers were mediating the disagreement between Lesovik and Podgorneac, they discovered the DVDs and CDs on display for sale or rent appeared to be pirated copies of legitimate DVDs.

12.     Rancho Cordova Police Detective Nate Wise #576 responded to Music Land at the request of the on duty Rancho Cordova Police Department Sergeant Jeff Hattersley to assist the patrol units. Upon his arrival he inspected the DVDs and CDs which Officers Baker and Gailey suspected to be pirated copies. Detective Wise also suspected the DVDs and CDs to counterfeit. I spoke with Detective Wise by telephone and he described an entire video store displaying counterfeit DVDs and CDs for sale or rent. He described the DVDs having poor color graphics, the movie titles and graphics displayed on some of the DVDs were cut off or didn't seem to fit right, some of the DVDs were labeled simply with a black permanent marker and none of the cases contained security seals like the packaging on legitimate product released by the Motion Picture Industry. Detective Wise also advised he could plainly see trademarks of companies such as Warner Bros™, Paramount™ and Disney™. I know those trademarks to be currently registered with the United States Patent and Trademark Office. Detective Wise described the CDs in similar fashion. The color graphics displayed were very poor, the titles and graphics appeared to not fit on the face of the disk and the packaging did not contain security seals.

13.     Based on this information, I responded to 11082 Coloma Road, Music Land, to further investigate what I suspected, based on Detective Wise's description, was an operation for trafficking counterfeit goods, registered trademarks there of, and music labels. Upon my arrival I spoke briefly with Detective Wise and he presented to me the items he believed to be counterfeit. The DVDs and CDs were just as he described. Some of the disks didn't have color graphics or an artistic design; just a movie title hand written in black permanent marker or a pre-cut disk shaped white paper label with the title typed in blue printer ink. This is not the format in which legitimate product released by MPAA member companies are produced. The disks displayed for sale on the shelves of Music Land were recordable format disks (DVD-Rs and CD-Rs).

14.     Present at the store on this date were Alex Podgorneac and **YAN AKHUMOV**. I spoke at length with **YAN AKHUMOV**. While talking to **YAN AKHUMOV**, he made admissions which confirmed he knew the CDs and DVDs he was selling and/or distributing were in fact counterfeit versions of legitimate product from American companies which displayed counterfeit registered trademarks. After his initial admission I stopped him and, although I did not intend to take **YAN AKHUMOV** into custody, I read **YAN AKHUMOV** his rights per Miranda. He told me he understood his

3

rights per Miranda and wished to continue speaking with me. **YAN AKHUMOV** made the following statements:

A)    **YAN AKHUMOV** identified himself to me as not only the store general manager but the store owner as well. **YAN AKHUMOV** explained the owner's name on paper is actually Oxana Sizorina but he is the one who runs the business and it is he who purchases the product for the business as well.

B)    **YAN AKHUMOV** told me the names of three companies from which he purchases the DVDs and CDs: Boris Productions, St. Petersburg Productions and Mosvipefilms. None of the company names from which **YAN AKHUMOV** says he purchases DVDs and CDs to sell in his store are companies authorized to sell or distribute MPAA member company product.

C)    **YAN AKHUMOV** and I walked over to a stack of DVDs displaying movie titles of American Motion Picture Industry companies such as The God Father and Indiana Jones; Raiders of the Lost Ark. **YAN AKHUMOV** wet his finger and swiped it across the title printed on the DVD and the writing smeared. He did that to show me the DVDs displaying American movie titles were the only DVDs which he referred to as "bad". I asked him if "bad" meant they were counterfeit or pirated and he said, "Yes."

D)    **YAN AKHUMOV** wet his finger again and repeated the test on a DVD displaying a Russian movie title but the title did not smear. At the passing of his wet finger swipe test, **YAN AKHUMOV** proclaimed the product legitimate therefore not illegal for him to sell. The **YAN AKHUMOV** approved DVD did not display any color graphics or artistic design, no name and address of the product manufacturer, no trademark of the contributing companies and "DVD-R" was printed on the inner ring of the disk.

E)    **YAN AKHUMOV** admitted he was contacted by an FBI agent about a year prior and was told selling counterfeit goods (DVDs and CDs) was illegal. **YAN AKHUMOV** said the FBI agent did not seize any product from him at the time, but he was only in possession of 40 to 50 counterfeit copies of legitimate product belonging to MPAA member companies. **YAN AKHUMOV** admitted he never did dispose of the counterfeit items as directed by the FBI agent. **YAN AKHUMOV** stated, "I should have just gotten rid of those last year. If you give me two hours I will have all of the counterfeit items removed from the store.

F)    **YAN AKHUMOV** advised me he purchases the same product from the same companies to stock all four of his stores and all of his stores have the same product which I strongly suspect as counterfeit. **YAN AKHUMOV** provided me with a business card which lists a total of six addresses for Music Land locations. **YAN AKHUMOV** advised he had to close two of the stores and only has four locations open for business: 11082 Coloma Road Suite #2, Rancho

Cordova, CA 95670, 908 Sacramento Avenue, West Sacramento, CA, 7331 Greenback Lane, Citrus Heights, CA and 5444 Watt Avenue #1000, North Highlands, CA.

      G)    **YAN AKHUMOV** told me the DVDs and CDs are shipped to him in mass on spindles; several different DVDs and/or CDs packaged on a single spindle. **YAN AKHUMOV** explained to me he has to purchase the black slim DVD cases and the CDs jewel cases separately and package the disks himself. In addition he has to print his own color copy inserts to slide into the clear plastic outer sleeve of the DVD cases. **YAN AKHUMOV** also seals the cases in cheap shrink wrap or re-sealable plastic overwrap. He does not apply security seals.

     15.    Based on the admissions by **YAN AKHUMOV**, as outlined above, I contacted the FBI about their prior contact. In 2007, the FBI was contacted by a concerned citizen, who reported a video store called Music Land located at the intersection of Watt Avenue and I Street was burning (manufacturing) DVDs using electronic DVD burning tower. Based on this information, FBI SA Marina V. Shalfeyeva and FBI SA John Cauthen investigated the complaint. FBI SA Cauthen conducted the interview with **YAN AKHUMOV**, the owner of Music Land. The investigation revealed a limited amount of product was confirmed to be counterfeit and was in **YAN AKHUMOV**'s possession. **YAN AKHUMOV** was directed to dispose of the counterfeit product and to cease selling the same. SA Cauthen presented **YAN AKHUMOV** with a copy of US Code Title 18 § 2319 and § 2320 which **YAN AKHUMOV** signed as an indication of his advisement and understanding the violation of federal copyright infringement and trafficking counterfeit goods laws.

     16.    Continuing with the investigation on 7/2/09, Investigators from Clear Cut Investigations, contractors of the MPAA and RIAA charged with investigating piracy and counterfeit trademark cases, responded to 11082 Coloma Road, Music Land, to assist in the examination and seizure of the product. The investigators confirmed the product was in fact counterfeit.

     17.    Approximately, 32,064 counterfeit items were seized from the 11082 Coloma Road location.

     18.    On 7/6/09 I obtained a search warrant for the remaining Music Land premises at 908 Sacramento Avenue, West Sacramento, CA, 7331 Greenback Lane, Citrus Heights, CA and 5444 Watt Avenue #1000, North Highlands, CA. Detectives of the Sacramento Valley Hi-Tech Crimes Task Force, Immigration and Customs Enforcement (ICE), California Department of Justice (DOJ), the Federal Bureau of Investigations (FBI), the California Highway Patrol (CHP) and the West Sacramento Police Department participated in the service of the warrant. The following are the total DVDs and CDs seized from each location:

        A)    908 Sacramento Avenue, West Sacramento, CA
             11,212 – DVDs

4,568 – CDs

B)   7331 Greenback Lane, Citrus Heights, CA
     7,426 – DVDs
     1,451 – CDs

C)   5444 Watt Avenue #1000, North Highlands, CA
     13,759 – DVDs
     17,308 – CDs

**Total DVDs – 32,397**
**Total CDs – 23,326**

19.     Immigration and Customs Enforcement Agent Gene Kizenko assisted in
the service of the search warrant at the 5444 Watt Avenue #1000 location. He translated
many of the Russian titles and confirmed many of the titles were in fact titles of
American movie companies and MPAA member companies. When the DVDs were
played, it was discovered that Russian voice-over had been recorded to share with the
Russian speaking community.

20.     Neither Music Land nor **YAN AKHUMOV** was an authorized party to
manufacture, alter, sell, transport, traffic or otherwise distribute goods or services of
MPAA and RIAA member companies or distributed labels thereof.

## EXAMINATION OF THE DVDs

21.     Many DVDs were packaged in black plastic cases with color copy inserts.
There were no security seals. The disks inside the cases were DVD-R format DVDs and
did not display the true name and address of the manufacturer which is required
according to California Penal Code Section 653w. The disks had a bluish tint and
appeared to have been burned using a computer. There were several registered
trademarks of MPAA member companies visible on the color copy inserts such as
Warner Bros., Paramount, Walt Disney, Universal, and Sony Pictures, among others.
There were other DVD cases which displayed the registered trademarks of non MPAA
member companies such as Hallmark, Lionsgate, Metro Goldwyn Mayer (MGM), and
Screen Gems, among others.

22.     MPAA member companies' legitimate products are replicated not burned
on a computer. Replicated DVDs are recognizable by a silver or gold tint. Burned DVDs
are recognizable by a red or bluish tint. Each of the DVDs in this case are burned to
DVD-Rs and have the bluish tint indicating they are counterfeit. Legitimate optical disks
from MPAA member companies also display the true name and address on the
manufacturer. This information is also absent on the media obtained via search warrant
from the Music Land stores.

23.     Based on my knowledge, training, and experience, I know legitimate optical disks are easily recognized because they are professionally packaged and labeled. A genuine DVD is always produced to a very high standard. Overall packaging usually features high-quality images, full color printing and good paper stock. The DVD is usually presented in a high quality plastic case or card box. Unauthorized DVDs are often packaged in a low-quality plastic case with re-sealable over-wrap, rather than sealed shrink wrap which is found on legitimate product. In this case a low quality heat sealed wrap was used.

24.     On the DVDs in Music Land, there were black plastic cases displaying color copy inserts (colored labels or artwork) which depicted the movie contained inside. The disks displayed poor graphics or silk screened color graphics which depicted the movie contained inside. The graphics were of poor quality.

25.     Based on my knowledge, training, and experience, I know individuals involved in the illegal duplication of DVDs simply photocopy the label from the legitimately manufactured DVD and affix it to the product. Other individuals use studio publicity materials as artwork for the package inserts which can be easily downloaded from the internet.

26.     I viewed many of the DVD-Rs and confirmed at least 300 registered trademark infringement violations. The DVD-Rs I viewed are listed in the "DVD-R" spreadsheet attached to this report. There were also several registered trademarks of companies not represented by the MPAA and RIAA present and clearly visible on the color copy inserts, within the graphics on the DVDs, as well as when viewing the movie. All of these trademarks have been confirmed registered with United States Patent and Trademark Office.

27.     Based on my training, experience, observations and examinations of the DVDs, their packaging, the display of member company studio trademarks on the color copy inserts as well as when viewed, I believe the items are pirate and/or bootleg versions of genuine product of MPAA member companies.

## EXAMINATION OF THE CDs

28.     As I examined the CDs closer I noted the disks were CD-R format CDs and did not display bar codes and numeric codes such as the IFPI number which genuine disks usually display. The coding present on the CD-Rs were simply batch numbers usually found on the inner ring of the CD-R indicating a recordable format CD.

29.     The International Federation of Phonographic Industry (IFPI) is a number which identifies sound recordings authorized by the music artist's label or recording company. I know IFPI represents the recording industry worldwide. Part of its mission is to safeguard the rights of record producers in all markets where its members operate.

7

30.     During my examination, I noted the disks did not display the true name and address of the manufacturer as required by California Penal Code Section 653w.

31.     The CD-Rs were packaged in clear hard plastic cases (jewel cases) similar to the cases used by legitimate music manufacturers but without a security seal. The cases also displayed poor color graphics (color copy inserts) which appeared to simply be color copies. Some were wrapped in a low quality heat seal plastic wrap.

32.     Based on my knowledge, training, and experience, I know some individuals involved in the illegal recording of CDs simply photocopy the label from the legitimately manufactured CD and affix it to the product. Other individuals use studio publicity materials as artwork for the package inserts which can be easily downloaded from the internet.

33.     On the color graphics I noted the registered trademarks of RIAA (Recording Industry Association of America) member companies such as Virgin Records, Geffen Records, Columbia Records, and Epic, among others. I also noted registered trademarks of non RIAA member companies such as Ploydor, Steamhammer, and Zomba, among others.

34.     Based on my training, experience, observations and examinations of the CDs, their packaging and labeling; I believe the disks to be unauthorized recordings of only the sound of legitimate recordings. Unauthorized recordings may include compilation CDs featuring one or more artists. They are sometimes referred to as DJ or Dance Mixes.

35.     The search of the businesses also yielded several boxes of color copy inserts amounting to more than 2000 trademark violations. The inserts displayed poor graphics and appeared to be color photocopies of legitimately manufactured cover artwork or studio publicity materials which can be easily downloaded from the internet. Many of the movie titles were printed prominently in Russian. The title was also printed less prominently in English usually below the Russian printing or near the bottom of the insert. Some of the inserts displayed only Russian printing on the front and the English title can be seen on the back with the movie credits. Trademarks registered with the United States Patent and Trademark Office were visible as well. Some of the trademarks I discovered are currently registered to companies such as Dolby Laboratories (Dolby Digital), MPAA (movie ratings i.e.: NC-17, PG-13, R, etc.), Warner Bros, Paramount Pictures, Sony Pictures, and Universal Pictures, among others.

36.     Roger Short contracted as an Investigative Consultant for RIAA Anti-Piracy Unit and Field Investigator for the MPAA conducted a formal examination of the DVDs and CDs seized from **YAN AKHUMOV**. Investigator Roger Short confirmed the counterfeit nature of the product and provided me with an expert declaration documenting the outcome of his examination.

37.     In addition, Roger Short is contracted as a Field Investigator by the Anti-Piracy Office ("APO") of the Motion Picture Association of America, Inc. (MPAA). The

8

MPAA is a trade association whose members are major film distribution companies in the United States. As a Field Investigator retained by the MPAA APO he conducts investigations as well as oversees investigations of suspected piracy. Investigator Short is also contracted as an Investigative Consultant for the Recording Industry Association of America, (RIAA), and within the organization by the Office of Special Counsel's Anti-Piracy Unit.

## Expert Examination of Seized DVDs and CDs

38.     Based on the examinations conducted by MPAA and RIAA, it was determined the DVDs and CDs obtained from Music Land stores and **YAN AKHUMOV** were illicit or used to manufacture illicit DVDs or CDs and violated Both Federal and State statutes. Additionally, investigators noted MPAA Member Company trademarks displayed in violation of both Federal and State statutes which included Warner Brothers, Disney, Sony, Universal, 20th Century, Paramount and Columbia. The illicit CDs included artists such as Britney Spears, Metallica, Beyonce and the sound track to the movie Titantic.

39.     The packaging is inconsistent with legitimate disks and consists of either an outer hard case with or without a color copy wrapper or stored on a spindle or inside a DVD/CD binder. The artwork printing on the wrappers is sub-standard and not consistent with legitimately produced merchandise. On most of the disks the titles were printed on the disk in Russian or Russian and English. Further evidence establishing that these items are counterfeit is the fact that all holograms, security devices and top seals are missing. Absent from all disks is any labeling; which would indicate the studio name or the true name address of the manufacturer. The disks lack all studio logos, © and ® marks and rights indicia.

40.     Based upon the examination of these DVDs, Investigator Short determined that the DVDs were either burned (DVD-R's) or pressed (replicated). It is my understanding that the MPAA member companies never release their titles in the DVD-R format. These disks contained recordings, the cover, box, jacket, or label of which does not clearly and conspicuously disclose the true name and address of manufacture thereof and the name of the actual author, artist, performer, producer, programmer or group. Based on Investigator Short's training, experience and the examination, he formed the opinion the suspect disks were never authorized for manufacture, distribution or sale and thus in violation of Both State and Federal Statues for Failing to disclose Origin of Recording Work. Additionally, the displaying of Member Company trademarks was also violation of both State and Federal Statues. Therefore, Investigator Short conclude they are unauthorized copies and piratical.

41.     Investigator Short determined each disk is a burned CD-R or pressed (replicated) CD. The packaging is inconsistent with legitimate disks and consists of either an outer hard case with or without a color copy wrapper or storage on a spindle or inside a DVD/CD binder. The artwork printing on the wrappers is sub-standard. On most of the disks the titles were printed in Russian or Russian and English. Absent from the packages are all holograms, security devices and top seals. Further evidence establishing that these items are counterfeit is the fact that absent from most disks is any

labeling which would indicate the actual author, artist, performer, producer, programmer or group or the true name address of the manufacturer.  Most disks lacks all studio logos, © and ® marks and rights indicia.

42.     Based upon the examination of these disks, Investigator Short determined the seized compact disks were of the burned (CD-R) or pressed (replicated) format. These compact disks contained recordings, the cover, box, jacket, or label of which does not clearly and conspicuously disclose the true name and address of manufacture thereof and the name of the actual author, artist, performer, producer, programmer or group.  Based on his training, experience and their examination, Investigator Short formed the opinion the suspect compact disks were never authorized for manufacture, distribution or sale and thus in violation of Both State and Federal Statues.

43.     I contacted RIAA Anti-Piracy Investigator Tom Rackleff for the purpose of conducting a more extensive examination of the music CDs using RIAA's "RepliCheck" program.  This program accurately identifies the song title, performing artist, releasing label and copyright date for songs in their database.  I selected more than 500 CDs and DVDs (containing music videos) and shipped them via FedEx to Rackleff. Rackleff conducted the exam using the RepliCheck program and identified more than 350 CDs which contained copyright protected material.  Rackleff also discovered copyright protected material on 35 music DVDs.

44.     Total Counterfeit Items (DVDs and CDs) Seized = 87,787

        DVDs – 50,503 X $19.00 (Average Retail value) = $959,557.00
        CDs – 37,285 X $13.18 (Average Retail Value) = $491,416.20

## Probable Cause to Believe Credit Card Fraud Occurred – in violation 18 USC 1029 – Access Device Fraud

45.     As previously outlined, on 7/2/09 Inna L., a victim in this case, reported her credit card was charged for three separate amounts: $5.45, $5.46 and $5.47 on June 29, 2009 at the Rancho Cordova Music Land.  This victim reported she was never at the Rancho Cordova Music Land on that date.  This victim also reported her credit card was charged the amount of $76.12 for a purchase she supposedly made at the Carmichael Music Land location.  This victim reported she has never been to the Carmichael Music Land location. When this victim inquired about the charges, she was told they were membership charges and the $76.12 was a late charge.  This victim doesn't belong to a club membership at Music Land and she reports there never was any mention of having to pay club membership dues.

46.     Also on this date Aleksander B. reported his U.S. Bank account was charged for several amounts for purchases he supposedly made at the Rancho Cordova Music Land. This victim reported the following amounts charged fraudulently to his account: $26.27 – 4/29/09, $5.45 – 5/4/09, $5.46 – 6/3/09, $19.00 (overdraft) – 6/4/09, $5.46 – 6/4/09 and $35.00 (overdraft) – 6/5/09.  This victim reported two more charges to his account for

purchases he supposedly made at the Carmichael Music Land: $5.44 – 4/3/09 and $5.44 – 4/6/09.

47.     Also on this date Valeriy V. also reported his credit card was charged for numerous amounts for purchases he supposedly made at Music Land. Vibe reported none of the charges were authorized by him. Vibe left the scene to make copies of his credit card statement but did not return with the details.

48.     Based on these victim statements, contact was made with **YAN AKHUMOV** at Music Land stores. Later a State Search Warrant for the Music Land stores was obtained. During the execution of this warrant, thousands of sales receipts were recovered. The receipts show charges in various amounts, generally low dollar amounts. The receipts show most credit card numbers were manually input; meaning the debit or credit card was not present to swipe as with a legitimate purchase.

49.     During a search of the Sacramento County Sheriff's Department's Report Management System (RMS) database for crime reports filed against **YAN AKHKUMOV** and Music Land, I discovered three separate incidents of credit card fraud naming Music Land the business where the fraud occurred. All three victims provided copies of their bank account statements and all incidents occurred within the County of Sacramento:

        A)     On Friday October 10, 2008, Sacramento resident Nadia K. reported her Wells Fargo Bank account was charged for amounts of which she was unaware. There were a total of six separate charges: $5.38 - 8/4/08, two charges for $5.40 – 9/8/08, $32.33 – 7/18/07, $22.63 – 7/25/07 and $5.38 – 10/8/08.

        B)     On Monday November 3, 2008, Rancho Cordova resident Natalia T. reported her debit/credit card account was charged with unauthorized amounts. This victim reported she was a customer at Music Land and the last time she was there was in June 2008. Since then she has found three unauthorized charges to her bank account. This victim confronted **YAN AKHUMOV** who she describes as the owner, after she discovered the first unauthorized charge and tried to dispute it. **YAN AKHKUMOV** told her it was a mistake and when she comes back in he would compensate her with DVDs or CDs. She left and **YAN AKHUMOV** did not reimburse her monetarily. Later, she discovered two more unauthorized charges at Music Land she again went in to confront **YAN AKHUMOV.** On this occasion, **YAN AKHUMOV** admitted to charging her card and he advised her to sign a form related to the fraud transactions. Due to this victim's limited knowledge and ability in speaking or reading the English language, she did not know she signed a form giving **YAN AKHUMOV** permission to access her bank account.

        C)     On 7/9/09, Alla P. reported her United Mileage Plus Visa card account through Chase bank has been charged fraudulently for a total of $1166.10

11

between the dates of February 8, 2008 through June 18, 2009. The amounts were $64.65 per month until April 24, 2009 then changed to $65.25 per month until June 18, 2009. This victim has been a customer at Music Land in the past but did not authorize these charges.

50.     On 6/10/10, I spoke with Alex Podgorneac by telephone. Podgorneac was detained at the Rancho Cordova store with **YAN AKHUMOV** on July 2, 2009. Podgorneac represented that he was an employee of **YAN KHUMOV'S** at the Music Land stores. As an employee of Music Land, he has knowledge of **YAN AKHUMOV**'s business practices. During my interview of him on 6/10/10, Podgorneac admitted **YAN AKHUMOV** directed him to manually input credit and debit card numbers and charge the cards for "membership fees" and "late fees".

51.     Podgorneac stated there was never a formal club membership program like other video rental stores established and many of the charges to credit and debit card accounts were done without the consent of the account holders. He stated, to his knowledge, the DVDs and CDs sold in all four of **YAN AKHUMOV**'s stores come from **YAN AKHUMOV**. Podgorneac can also confirm **YAN AKHUMOV** had possession of burning towers used to manufacture counterfeit DVDs and CDs. Podgorneac told me **YAN AKHUMOV** directed him to remove similar devices and other computer related equipment from the 5444 Watt Avenue location and take them to another location prior to my serving of the search warrant.

52.     Based on my knowledge, training, experience, and consultation with other law enforcement agencies, I know that credit card numbers that are manually keyed in for charge transactions are commonly associated with access device fraud schemes.

53.     Based on my knowledge, training, experience, and consultation with other law enforcement agencies, I also know that individuals engaged in credit card fraud will commonly charge the cards in small amounts in order to evade detection by the true cardholder.

**Conclusion**

54.     Based on my knowledge, training and experience, I know that individuals engaged in the trafficking of counterfeit merchandise commonly keep invoices, receipts, and contacts related to their fraud scheme on their person.

55.     Based on my knowledge, training, and experience from past investigations and in consultation with other law enforcement and industry experts in the field of Trademark and Copyright Infringement and Trafficking in Trademarked Goods, I know that counterfeit DVDs and CDs will have handwritten titles on the disks and poor quality cover art and packaging.

56.     During the execution of the State Search Warrant in excess of 50,000 counterfeit DVDs and CDs were located in the stores owned and operated, by his own admissions to law enforcement, by **YAN AKHUMOV**.

57.     As outlined above **YAN AKHUMOV**, based on his previous contact with the FBI Special Agents, he had knowledge of United States Trademark and Copyright law.

58.     Based on my knowledge, training, and experience, I know that **YAN AKHUMOV** through his business Music Land and its employee Alex Podgorneac caused multiple access device numbers to be charged without the consent of the true cardholders. Based on the facts outlined above, I know that during a one year period multiple access devices were fraudulently charged and that these charges were in excess of $1,000, in violation of 18 U.S.C. 1029 (a)(2).

59.     I therefore request that the Court authorize the issuance of this criminal complaint against:

       a.     **YAN AKHUMOV**
             DOB: 7/6/1965

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

TFO D.T. BROWN
Special Deputy – U.S. Marshal
United States Department of Justice

Sworn to before me this
th day of June, 2010

HONORABLE KIMBERLY A. MUELLER
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF CALIFORNIA

Approved as to Form

Robin R. Taylor
United States District Court
Eastern District of California